PEPPER HAMILTON LLP
Ronald R. Jewell (Bar No. 1572270)
The New York Times Building
37th Floor
620 Eighth Avenue
New York, NY 10018-1405
Telephone: 212.808.2700
Facsimile: 212.286.9806
E-mail: jewellr@pepperlaw.com

PEPPER HAMILTON LLP
David M. Fournier (*pro hac vice*)
1313 N. Market Street, Suite 5100
Wilmington, DE 19801
Telephone: 302.777.6565
E-mail: fournierd@pepperlaw.com
Michael J. Custer (*pro hac vice*)
Telephone: 302.777.6516
E-mail: custerm@pepperlaw.com

*Counsel for Ad Hoc Committee of Certain Senior
Secured Noteholders*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| SIFCO S.A., | ) | Case No. 14-11179 (MG) |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**OBJECTION OF AD HOC COMMITTEE OF CERTAIN SENIOR SECURED
NOTEHOLDERS TO VERIFIED PETITION FOR RECOGNITION OF FOREIGN
MAIN PROCEEDING AND REQUEST FOR CHAPTER 15 RELIEF [DOCKET NO. 2]**

# TABLE OF CONTENTS

OBJECTION OF AD HOC COMMITTEE OF CERTAIN SENIOR SECURED NOTEHOLDERS TO VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND REQUEST FOR CHAPTER 15 RELIEF [DOCKET NO. 2] ................... 3

GENERAL BACKGROUND ................................................................................................ 3

OBJECTION TO RECOGNITION ...................................................................................... 6

I.      Insider Transactions and the Foreign Representative's Possible Role ............................ 7

II.     The Proposed Recognition Order Must be Modified Even if Recognition is Appropriate .................................................................................................... 13

        A.      Section 1520 and the Automatic Stay are Self-Effectuating ............................... 13

        B.      The Secured Funds Should Not Be Entrusted to the Foreign Representative ...... 14

        C.      Any Other U.S. Assets Should Be Entrusted to an Examiner ............................. 18

CONCLUSION ................................................................................................................ 20

#30055986 v11

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re ABC Learning Centres Ltd.*, 728 F.3d 301 (3d Cir. 2013).....................................................13

*In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96 (Bankr. S.D.N.Y. 2012)...................................14

*In re Granite Broadcasting Corp.,* 369 B.R. 120 (Bankr. S.D.N.Y. 2007),
*appeal dismissed by, as moot,* 385 B.R. 41 (Bankr. S.D.N.Y. 2008).............................................18

*In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614 (Bankr. S.D.N.Y. 2010).........................13, 14, 15

*In re Sivec SRL*, 476 B.R. 310 (Bankr. E.D. Okla. 2012).............................................................14

*In re Treco*, 240 F.3d 148 (2d Cir. 2001)...............................................................................13, 14

STATUTES

*11 U.S.C. § 362* ......................................................................................................................10, 11

*11 U.S.C. § 1520* ....................................................................................................................10, 11

*11 U.S.C. § 1521(a)(5)* ...........................................................................................................15, 17

*11 U.S.C. § 1522(a)* .....................................................................................................................12

*11 U.S.C. § 1522(b)* .....................................................................................................................16

*11 U.S.C. § 1506* ...........................................................................................................................8

*11 U.S.C. § 1507(b)(4)*................................................................................................................13

*28 U.S.C. § 1746* .......................................................................................................................8, 12

#30055986 v11

**OBJECTION OF AD HOC COMMITTEE OF CERTAIN SENIOR SECURED
NOTEHOLDERS TO VERIFIED PETITION FOR RECOGNITION OF FOREIGN
MAIN PROCEEDING AND REQUEST FOR CHAPTER 15 RELIEF [DOCKET NO. 2]**

The Ad Hoc Committee of Certain Senior Secured Noteholders (the

"**Noteholders**"),[1] through its undersigned counsel, objects to the Foreign Representative's

*Verified Petition for Recognition of Foreign Main Proceeding and Request for Chapter 15 Relief*

[Docket No. 2] (the "**Verified Petition**").  In support of their objection, the Noteholders state as

follows:

## GENERAL BACKGROUND

1.       The Ad Hoc Committee of Certain Senior Secured Noteholders is

comprised of entities (each, a "**Noteholder**") collectively holding $23,307,000 stated principal

amount (or no less than 31.08%) of the 11.50% Senior Secured Notes due 2016 of Sifco S.A.

(the "**Debtor**"), issued on or about May 27, 2011 (the "**Senior Secured Notes**"), as of the date

hereof.

2.       The Debtor asserts that it has approximately $75 million of indebtedness

evidenced by the Senior Secured Notes outstanding[2] as of the filing of its Chapter 15 bankruptcy

petition.  See *Ex Parte Application for Order (A) Granting Provisional Relief and Injunction and

(B) Scheduling Hearing* [Docket No. 5] (the "**Provisional Relief Application**", at ¶ 14).

---

[1] To date, the Ad Hoc Committee of Certain Senior Secured Noteholders is comprised of ICE Focus EM Distressed MSTR, ICE Global Credit MTR FD LTD, ICE EM Multi Sector Income FD, JPMC Retirement Plan – Ice Canyon Multi Strategy Emerging Markets DEB, EOC LUX Securities SARL and Fratelli Investment Ltd.

[2] There may be less than $75 million of Senior Secured Notes "outstanding" for certain purposes under the governing indenture (the "**Indenture**").  For example, under Section 9.06(g) of the Indenture any Senior Secured Notes held by or for the account of the Debtor, its subsidiaries or affiliates are not deemed to be "outstanding" for voting purposes.  Some of the Senior Secured Notes may be held by persons who may be affiliates of the Debtor. Without limitation, the Debtor has disclosed that it and its subsidiaries have an investment in Orion Investment Fund III Limited ("**Orion**"), and that Orion holds "Global Medium Term Notes" (i.e. Senior Secured Notes). See Note 5b of the Debtor's financial statements for 2011 and 2012, and Note 5b of the Debtor's financial statements for 2012 and 2013,  attached as **Exhibits A-1** and **A-2** hereto, respectively.

3.     The Senior Secured Notes were issued pursuant to (i) the Indenture dated as of May 27, 2011, (ii) Offering Circulars dated May 27, 2011 and June 3, 2011 (the Offering Circular dated June 3, 2011 being herein referred to as the "**Offering Circular**"), and (iii) an Offering Circular Supplement dated May 27, 2011 and "Final Terms" dated May 27, 2011 (the "**Supplement**").  The Bank of New York Mellon ("**BNY Mellon**") is the "**Trustee**", Registrar, New York Paying Agent and Transfer Agent for the Senior Secured Notes.

4.     As set forth in the Provisional Relief Application, the Senior Secured Notes are collateralized under an Account Control Agreement dated May 27, 2011 (the "**Account Control Agreement**"), granting BNY Mellon, for the benefit of itself and the holders of the Senior Secured Notes, a first priority secured interest in a cash collateral account currently on deposit with and maintained by BNY Mellon as Depository, Collateral Agent and Securities Intermediary (the "**Debt Service Reserve Account**").  Pursuant to the Account Control Agreement, the Debtor effectively ceded all control over the Debt Service Reserve Account to BNY Mellon.[3]

---

[3] Pursuant to the Account Control Agreement, Section 2.5 (Grantor's Access to Debt Service Reserve Account Trustee's Control of Debt Service Reserve Account):

"Except as expressly set forth herein, Grantor shall not make any withdrawals from the Debt Service Reserve Account or issue any "entitlement orders" (as such term is defined in Article 8 of the UCC) with respect to financial assets credited to the Debt Service Reserve Account and shall have no access to the Debt Service Reserve Account. Except as otherwise provided by this Agreement, (i) the Trustee shall have exclusive access to and control over the Debt Service Reserve Account and any funds or financial assets credited to or on deposit therein and (ii) the Depository agrees that it shall comply with any directions, instructions, orders and entitlement orders originated by the Trustee in connection with the foregoing without further consent by the Grantor."

Also, pursuant to clause (e) of Section 2.8 (Additional Provisions Regarding Debt Service Reserve Account):

"If at any time the Depository shall receive any order from the Trustee directing transfer or redemption of any financial asset relating to the Debt Service Reserve Account, the Depository shall comply with such entitlement order without further consent by the Grantor or any other Person (it being expressly agreed that the Grantor shall not be entitled to issue, and the Depository shall not follow, any entitlement orders or instructions issued by the Grantor with respect to the Debt Service Reserve Account, any financial assets credited thereto or any security entitlement with respect to any of the foregoing except as expressly set forth herein); . . . ."

-4-

5.      The Debt Service Reserve Account is located in New York, New York. Under the Account Control Agreement, it is required to be funded with two semi-annual interest payments.  According to the Foreign Representative, the Debt Service Reserve Account currently holds approximately $8.5 million (Provisional Relief Application, at ¶ 15 ); however, the Noteholders are advised that the current balance in the Debt Service Reserve Account is approximately $8,625,000 (the "**Secured Funds**").

6.      According to the Foreign Representative, "[o]ne of the reasons for commencement of this case … is to protect the funds on deposit pursuant to the Account Control Agreement during the pendency of the Brazilian Proceeding in order to provide for an orderly restructuring process that is fully administered out of the Brazilian Court, without the distraction of piecemeal efforts by particular creditors attempting to gain an advantage to the detriment of others."  Provisional Relief Application, at ¶ 17.  The Verified Petition likewise alleges that "pending development and approval of a restructuring plan by the Brazilian Court, SIFCO requires the protection afforded to foreign debtors pursuant to Chapter 15 of the Bankruptcy Code in order to protect its valuable assets in the United States."  Verified Petition, at ¶ 6.  The only U.S.-based assets identified by the Foreign Representative in the Verified Petition are the Debtor's claimed rights to the Debt Service Reserve Account and the Debtor's "rights under an exclusive supply contract with Westport Axle Corp." (the "**Westport Supply Contract Rights**").  Id.  As no information has been provided regarding that supply contract, it is unclear what continuing rights the Debtor has therein.

---

The Debtor is the "Grantor" under the Account Control Agreement.

#30055986 v11

7.      While the Foreign Representative asserts that the Debtor holds an interest in the Debt Service Reserve Account, the Noteholders do not concede that interest.  Neither the Debtor nor the Foreign Representative have any right to access the funds in the Debt Service Reserve Account, nor are they in a position to provide sufficient protection of the interests and liens of BNY Mellon and the Noteholders to permit such access.  Therefore, as discussed below, there is no proper purpose served by a continuing injunction against BNY Mellon accessing the Debt Service Reserve Account for the benefit of holders of Senior Secured Notes (excluding the Debtor and its affiliates and insiders as holders of Senior Secured Notes).  Indeed, the Debt Service Reserve Account must be protected from the reach of the Debtor and other creditors and any possible access by insiders.

8.      On the other hand, the Noteholders have identified potential fraudulent transfer and other claims in the United States against affiliates and insiders of the Debtor (and possibly other parties who participated in those transactions) related to the "Westport Transactions" discussed below.  Assuming that the Debtor has some legitimate property interests to protect in the United States, the publicly available information (particularly as to the pre-filing conduct of the Debtor in enabling insiders and other parties to strip valuable U.S. assets from the Debtor and its subsidiaries) suggests that the insider-affiliated Foreign Representative is not an appropriate steward of those interests.

### OBJECTION TO RECOGNITION

9.      The Noteholders have four primary objections to the Foreign Representative's request for final recognition and his ancillary request to control U.S. assets of the Debtor:

      i.      Publicly available information suggests that the Debtor, through its insider-employed Foreign Representative, comes to this Court with unclean

#30055986 v11

hands, with the Debtor's parent having siphoned off its most valuable U.S. asset just months before commencing this case;

ii.      Even if the Court finds that recognition is appropriate, the Foreign Representative cannot be entrusted with the Debt Service Reserve Account;

iii.     Even if the Court finds that recognition is appropriate, the Debtor's U.S. assets comprising claims and causes of action should be entrusted not to the Foreign Representative, but rather to an examiner with expanded powers to investigate, identify, pursue and realize those assets for the benefit of creditors; and

iv.     Even if the Court finds that recognition is appropriate, the Foreign Representative seeks inappropriately broad relief in his proposed Recognition Order.

## I.      INSIDER TRANSACTIONS AND THE FOREIGN REPRESENTATIVE'S POSSIBLE ROLE

10.     By his pleadings in this case, the Foreign Representative provided this Court with only a very general description of the Debtor's history, operations and assets in Brazil and the United States.  See Verified Petition, at ¶¶ 12 - 15.

11.     The Foreign Representative devoted scant discussion, however, to the May 2013 sale of the Debtor's former indirect subsidiary Westport Axle Corporation ("**Westport**"), a Kentucky corporation (the "**Stage I Westport Transaction**," and together with the "**Stage II Westport Transaction**" described below, the "**Westport Transactions**"), acknowledging simply that such sale occurred.  See Verified Petition, at ¶ 14.  The Noteholders believe it would be appropriate for the Foreign Representative to provide the Court and parties in interest with a more fulsome picture of the Westport Transactions in connection with the

-7-

Verified Petition.  Set forth below is what the Noteholders have been able to glean of the

Westport Transactions from publicly available information.

12.     According to the Debtor's "Quarterly Information June/2013

Administration Report," on May 17, 2013, the Debtor's subsidiary, Sifco Intercontinental Co.

Ltd. ("**Sifco Intercontinental**"), sold 100% of the capital stock of Westport to a company ("**SM**

**International**") owned at that time by Sifco Metals Participações S/A ("**Sifco Metals**").  Sifco

Metals is a debtor party (with the Debtor) in the Brazilian Proceeding for which the Foreign

Representative seeks recognition in this case.  According to the Debtor, Sifco Metals is the sole

shareholder of the Debtor,[4] and its ultimate controlling shareholders are (or were at the time of

the issuance of the Offering Circular for the Senior Secured Notes) Sebastião Luis Pereira de

Lima, Antonio Carlos Haddad and Antônio Campello Haddad Filho and entities principally

owned by them.[5]  The financial statements of the Debtor reflect a history of numerous related

party or insider transactions (including the sale or purchase of assets, guarantees of loan and

financing agreements, leases and other financial transactions entered into by related parties), the

extent and complexity of which are nearly impossible to decipher by merely reading those

financial statements.  The Westport Transactions are just the latest related party or insider

transactions of which the Noteholders are aware.

13.     It appears that, in the Stage I Westport Transaction, the purchase price for

Sifco Intercontinental's 100% interest in Westport was **$26.4 million**, consisting of (i) $19.9

million in cash (75% of the purchase price), and (ii) a promissory note for the remaining $6.5

---

[4] See Note 26 of the Debtor's financial statements for 2012 and 2013,  attached as **Exhibit A-2** hereto.

[5] See **Exhibit D** attached hereto (Offering Circular at page 78 – "Principal Shareholder") and Note 26 of the Debtor's financial statements for 2012 and 2013,  attached as **Exhibit A-2** hereto.

million, payable by Sifco Metals to the Debtor over six years (the "Sifco Metals Promissory Note").[6]

14.     While the Debtor has stated that it received the cash portion of the purchase price in the Stage I Westport Transaction, the Noteholders are unable to confirm whether any portion of the cash purchase price in the sale was in fact paid to the Debtor, and the likelihood of the Sifco Metals Promissory Note ever being paid is questionable since Sifco Metals is one of the debtors in the Brazilian Proceeding.[7]

15.     Just **seven months** after Sifco Metals purchased Westport for **$26.4 million**,[8] Westport was sold to Universal Truckload Services, Inc. (the "**Stage II Westport**

---

[6] This is reflected at Note 1 of the "SIFCO S/A Quarterly Information June/ 2013 Administration Report". However, when the Debtor issued its 2013 year-end financial statements, the Sifco Metals Promissory Note was no longer characterized as an obligation of Sifco Metals. See Note 1 (at page 13) of the Debtor's financial statements for 2012 and 2013, attached as **Exhibit A-2** hereto. As discussed in footnote 7 below, the filings and schedules in the Brazilian Proceeding state that Sifco Metals now has no debts.

[7] It is not clear from the Debtor's financial statements whether the cash portion of the purchase price was ever in fact paid by Sifco Metals, and further investigation is warranted. Moreover, there appears to have been a substantial accounts receivable of R$34.56 million (or approximately US$13.9 million) owed to Debtor by Sifco Metals as of December 31, 2013; and a greater amount, R$59.163 million (or approximately US$23.9 million), owed by Sifco Metals to the Debtor and its subsidiaries as a consolidated group.  See Note 23 of the Debtor's financial statements for 2012 and 2013, attached as **Exhibit A-2** hereto.  However, filings and schedules in the Brazilian Proceeding show no debts of Sifco Metals as of August 29, 2014.  Further investigation is warranted as to why the substantial accounts receivable Sifco Metals owed to Debtor at the end of 2013 (less than four months prior to commencement of the Brazilian Proceeding on April 22, 2014) is no longer listed. Likewise, the Sifco Metals Promissory Note is not listed as a debt of Sifco Metals or as an asset of the Debtor or its subsidiary, Sifco International.

[8] In December 2013, the parties to the Stage I Westport Transaction modified the terms of the transaction retroactively in order to improve the optics of the sale to Sifco Metals. The Debtor stated, in note 1 to its financial statements for the year ended December 31, 2013, that "an Amendment to the Contract of Purchase and Sale of Westport was signed and the US$15.5 million already received by Sifco due to the Supply Contract and the Service Rendering Contract were included as part of the sale price of the company." This modification of the Stage I Westport Transaction was apparently in connection with the Stage II Westport Transaction and, together with the other transactions by the Debtor in support of the Stage II Westport Transaction, shows that the Debtor enabled Sifco Metals to strip substantial value away from the Debtor and its creditors. See Section 2.4(b), clauses (vii)-(viii) (Closing; Closing Deliverables) of the Unit Purchase Agreement by and among Universal Truckload Services, Inc., Hiberis International Corp., SM International Holdings, and Sifco Metals Participações, S.A. dated November 27, 2013, attached as **Exhibit B** hereto.

-9-

**Transaction**") for approximately **$123 million**; a **$96.6 million gain (366%)** in **seven months**.[9]

Assuming the Debtor's disclosure that Westport had generated EBITDA of $8.18 million in 2012,[10] Westport was sold to Sifco Metals' subsidiary at a 3.23x EBITDA multiple,[11] and then resold just seven months later at a 15.04x EBITDA multiple.  Of course, any calculation based on the sale price in the Stage I Westport Transaction assumes that the cash portion of the purchase price was in fact paid to the Debtor, and assumes that any value can be ascribed to the Sifco Metals Promissory Note or that it will be paid (which is questionable as a result of the commencement of the Brazilian Proceeding).

16.     The Foreign Representative has not provided any additional documents or information regarding the Westport Transactions and the complicity of Debtor and other parties and individuals in causing valuable assets to be stripped away from the Debtor and its creditors.[12] Further inquiry into the sale of Westport to the Debtor's controlling shareholder, including the

---

[9] See "Universal Truckload Services Inc. December 2, 2013 press release", attached as **Exhibit C-1** hereto, together with the SEC Forms 8-K filed by Universal Truckload Services Inc. attached as **Exhibits C-2 and C-3**.

[10] See Note 1 (at page 13) of the Debtor's financial statements for 2012 and 2013, attached as **Exhibit A-2** hereto.

[11] Even with the reallocation to purchase price of US $15.5 million already received by SIFCO due to the Supply Contract and the Service Rendering Contract (as discussed above), Westport would have been sold to Sifco Metals at only a 5.12x EBITDA multiple.

[12] The Debtor stated also, in note 1 to its financial statements for the year ended December 31, 2013 (attached as **Exhibit A-2** hereto), that the Stage I Westport Transaction sale price was supported by appraisals; however, the Debtors original disclosures regarding the Stage I Westport Transaction at Note 1 of the "SIFCO S/A Quarterly Information June/ 2013 Administration Report" made no mention of any such appraisals, and the Debtor has failed to make those appraisals (or any "fairness opinion", which was required under Section 4.12 of the Indenture) available.  Indeed, the Debtor and the Foreign Representative have failed to provide any of the material documents and information for either the Stage I Westport Transaction or the Stage II Westport Transaction, including the minutes of any meeting of the boards of directors of the Debtor and its subsidiaries in authorizing and approving the Westport Transactions, a full accounting of the flow of funds among the parties to the Westport Transactions and whether other covenants under the Indenture were breached by the Debtor.  The Debtor and the Foreign Representative refused to provide any documents or information unless the Noteholders executed an agreement preventing use of the same in this or any other proceeding; and the Noteholders declined to be so restricted.

.

#30055986 v11

adequacy of the consideration received, and whether any of the purchase price was in fact received, or will eventually be received, by the Debtor, and the highly profitable quick resale of Westport to Universal Truckload Services, Inc. is clearly warranted in connection with the Foreign Representative's request for relief from this Court.  While there has been no need for the Court to determine whether improper self-dealing occurred in order simply to continue the existing injunction in effect until the Court rules on final recognition, those issues may be considered by the Court in assessing the propriety of final recognition and any ancillary relief that may be requested by the Foreign Representative under Sections 1519 or 1521 of the Bankruptcy Code.

17.     The Debtor remains in possession of its assets and operations in Brazil, much as a debtor-in-possession would in the United States.  Verified Petition, ¶ 30.  The direct shareholder, and the individual indirect shareholders, of the Debtor who profited from the Westport Transactions still control the Debtor.  As such, evidence of improper self-dealing by those still in control of the Debtor, if further investigation were to bear that out, would be particularly troubling where this Court is asked to place U.S. assets under the control of a foreign representative selected and employed by insiders, as opposed to a trustee or other disinterested fiduciary.  Indeed, if an investigation establishes improper self-dealing of such a nature as would warrant appointment of a trustee were this case pending under Chapter 11 of the Bankruptcy Code, it would be manifestly contrary to public policy of the United States to place administration of any U.S.-based claims and causes of action under the control of the Debtor and the Foreign Representative, calling into play the Court's powers under section 1506 of the Bankruptcy Code.

18.     As set forth in the *Declaration of Ruben Leite Pursuant to 28 U.S.C. §
1746* (the "**Foreign Representative Declaration**") [Docket No. 3], the Foreign Representative
served as the Debtor's controller from 2004 to 2006, and the Debtor's Head of Investor Relations
in 2012. Foreign Representative Declaration, at ¶ 3. From January 2007 to August 2011,
however, the Foreign Representative was the Financial Director for "a related company." Id.
Likewise, since January 2013 the Foreign Representative "ha[s] been employed by a related
company." Id. The Foreign Representative does not disclose what "related companies" have
been employing him or his current role with the "related company," nor does he disclose what
involvement he had in the Westport Transactions. If the facts surrounding the Westport
Transactions could even arguably give rise to claims (fraudulent transfer or otherwise) against
the Debtor's corporate parent or controlling shareholders and other participants in the Westport
Transactions, then before entrusting U.S. assets (including claims) to his care, this Court and the
Debtor's creditors should be informed as to (i) whether the Foreign Representative was involved
in any way in the Westport Transactions, (ii) the nature of his connection with the Debtor's
insiders, and (iii) all transactions between the Debtor and its insiders related to any of the
Debtor's U.S. assets.[13] If the Foreign Representative has a conflict of interest that would
disincentivize him from pursuing any claims in the United States or safeguarding the interests of
the Debtor and creditors with regard to assets in the United States, he should not be entrusted
with the administration of those assets.

---

[13] Mere denials by the Foreign Representative of involvement, or denials by the Debtor of its actions in enabling, the Westport Transactions and other insider transactions will not suffice. Mandatory production of relevant documents to the Noteholders or an examiner, and other discovery from the Foreign Representative and Debtor's insiders, is necessary to protect the interests of creditors.

#30055986 v11

## II.   THE PROPOSED RECOGNITION ORDER MUST BE MODIFIED EVEN IF RECOGNITION IS APPROPRIATE

### A.   Section 1520 and the Automatic Stay are Self-Effectuating

19.   Under the guise of implementing the provisions of section 1520 of the Bankruptcy Code (which are self-effectuating and need no reiteration in a recognition order to become applicable), the Foreign Representative seeks injunctive relief that differs materially from that which is automatically applicable under section 1520.  At paragraph 3 of the proposed Final Recognition Order, the Foreign Representative asks the Court to order that:

> v.   the protections of section 362 of the Bankruptcy Code apply with respect to the Debtor and the property of the Debtor in the territorial jurisdiction of the United States;

> vi.   all persons and entities are enjoined from seizing, attaching and/or enforcing or executing liens or judgments against the Debtor's property in the United States or from transferring, encumbering or otherwise disposing of or interfering with the Debtor's assets or agreements, rights, services, and operations in the United States without an order from the Brazilian Court **or** this Court permitting such action; and

> vii.   all persons and entities are enjoined from commencing or continuing, including the issuance or employment of process of, any judicial, administrative or any other action or proceeding **involving or against** the Debtor or its assets or proceeds thereof that are located in the United States, or to recover a claim or enforce any judicial, quasi-judicial, regulatory, administrative or other judgment, assessment, order, lien or arbitration award against the Debtor or its

-13-

assets or proceeds thereof that are located in the United States without an order

from the Brazilian Court **or** this Court permitting such action.

Verified Petition, at Exhibit A, p.3 (emphasis added).

20.     Paragraph 3 of the proposed order goes well beyond the well-defined scope of section 362 of the Bankruptcy Code, and is wholly unnecessary given the self-effectuating provisions of section 1520 of the Bankruptcy Code and the statutory imposition of the automatic stay upon final recognition.  Paragraph 3 of the proposed order would prohibit the Trustee, the Noteholders, any other creditor or any examiner appointed by this Court from investigating or prosecuting claims against the Debtor's non-debtor affiliates and insiders or taking any action in the Brazilian Proceeding which involves the Debtor or its assets or the proceeds thereof.  Moreover, by the final clause in subparagraphs 3(ii) and (iii) of the proposed Final Recognition Order, the Foreign Representative would have this Court delegate to the Brazilian Court the ability to dictate when and how assets may be removed from the United States or stay relief granted.  This would represent an inappropriate and impermissible usurpation of this Court's authority in this Chapter 15 proceeding.

21.     Accordingly, the Noteholders respectfully request that, if the Court is otherwise inclined to grant the Verified Petition, the proposed Recognition Order be modified to strike sub-paragraphs (i), (ii) and (iii) of decretal paragraph 3 on page 3.

**B.     The Secured Funds Should Not Be Entrusted to the Foreign Representative**

22.     In the proposed Recognition Order the Foreign Representative also requests a finding that "[t]he Foreign Representative is entitled to all the relief provided pursuant

to sections 1520 and 1521(a)(5) of the Bankruptcy Code." Id. at p. 3, ¶ 10.[14] While section 1520

is self-effectuating and merely specifies rights that flow automatically from recognition of a

foreign proceeding, section 1521 is permissive, and speaks to relief that the Court <u>may</u> grant for

cause upon recognition of a foreign proceeding. In fact, the court may only grant discretionary

relief under section 1521 "if the interests of creditors and other interested parties, including the

debtor, are sufficiently protected." 11 U.S.C. § 1522(a).

23.    With respect to the Debt Service Reserve Account, the relief the Foreign

Representative seeks by the proposed Recognition Order goes beyond a mere preservation of the

status quo at the time of filing, and the Noteholders are concerned that the Foreign

Representative could attempt under cover of the proposed order to transfer the Secured Funds to

Brazil for administration by the Brazilian court, irrespective of the priority of distribution to

which the Noteholders are entitled by virtue of their security interest in the funds under United

States law and the Account Control Agreement, and without the provision of sufficient

protection to the Noteholders, and ignoring the express terms of the Account Control Agreement.

The Declaration submitted by the Debtor's Brazilian restructuring counsel reinforces this

concern. <u>See</u> *Declaration of Geraldo Gouveia Junior Pursuant to 28 U.S.C. § 1746*

*Supplementing (I) Voluntary Petition Form and (II) the Foreign Representative's Motion for*

*Order Granting Relief in Aid of Foreign Proceeding* (the "**Gouveia Declaration**") [Docket No.

4].

---

[14]    Although the Noteholders do not understand the Foreign Representative to be seeking pursuant to
section 1521(b) entrustment of distribution of the Debtor's U.S.-based assets, and the proposed Recognition Order
does not provide for such relief, the Noteholders would object to the Foreign Representative being so entrusted with
respect to the Secured Funds or any other U.S.-based assets of the Debtor, for the same reasons set forth herein with
respect to relief under section 1521(a).

-15-

24.     The Debtor's Brazilian counsel represents that under Brazilian law, at least seven classes of administrative claims are given super-priority over the claims of other creditors (including the "costs of the bankruptcy proceedings"). <u>Gouveia Declaration</u>, at ¶ 31. Following the payment of such super-priority administrative claims, labor-related claims and all occupational claims are paid. <u>Id.</u> at ¶ 32. Only then are secured claims paid, up to the value of the assets encumbered in connection with such claims. <u>Id.</u> Given this priority scheme under Brazilian law and the authority he seeks under the proposed Final Recognition Order, the Foreign Representative may attempt to transfer the Secured Funds to Brazil to fund the payment of super-priority claims, in derogation of the Noteholders' priority of payment with respect to the Secured Funds under United States law.[15]

25.     It is beyond argument that secured creditors enjoy special protected status under United States law. *In re Treco*, 240 F.3d 148, 159-60 (2d Cir. 2001); *In re ABC Learning Centres Ltd.*, 728 F.3d 301, 310 (3d Cir. 2013). Moreover, Chapter 15 grants secured creditors the same protections that they would otherwise enjoy in a plenary bankruptcy case, including the right to adequate protection. *In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 628 (Bankr. S.D.N.Y. 2010) (the attached funds at issue constituted secured parties' cash collateral, and because under section 1520 recognition of a foreign proceeding triggers the applicability of sections 361 and 363 of the Bankruptcy Code, the foreign administrator could only use such cash collateral with the secured parties' consent or further order of the court and upon provision of adequate protection); *In re Sivec SRL*, 476 B.R. 310, 323 (Bankr. E.D. Okla. 2012) ("Chapter 15

---

[15] Additionally, the Noteholders are reviewing filings made by the "judicial administrator" in the Brazil Proceeding which indicate that certain claims against the Debtor are "extra judicial" claims (primarily tax claims) and not subject to the reorganization of the Debtor and discharge in the Brazilian Proceeding. The release of the Secured Funds to the Debtor either directly or through its Foreign Representative could make them available to satisfy such "extra judicial" claims. The use of the Secured Funds by the Debtor and the Foreign Representative to pay claims that are wholly outside the foreign bankruptcy court's jurisdiction would be contrary to section 1507(b)(4) of the Bankruptcy Code.

#30055986 v11

provides little guidance to courts to determine whether it is appropriate to grant a request to turnover local assets to a foreign representative to distribute in the main proceeding, although it does expressly grant secured creditors the same protections afforded by the U.S. Bankruptcy Code by triggering the applicability of §§ 361 and 363 upon recognition of the foreign proceeding.").

26.     Courts in this jurisdiction not only recognize secured creditors' right to adequate protection in the Chapter 15 context, but also protect secured creditors where the distribution scheme under a foreign jurisdiction's insolvency law subverts the protections afforded a secured creditor in its collateral under U.S. bankruptcy law. *Treco*, 240 F.3d at 151 (concluding that if the bank's claim against Bahamian debtor was secured, turnover of funds in the bank's possession would be improper under the predecessor statute to Chapter 15, section 304(c)(4), because Bahamian law subordinated the secured claim to, inter alia, the administrative expenses of liquidation, which was inconsistent with U.S. bankruptcy law's protection of secured creditors and threatened to destroy the bank's claim); *Int'l Banking Corp.*, 439 B.R. at 621 (under *Treco* the Bankruptcy Court for the Southern District of New York is required to protect a secured creditor in the United States from being reduced to an unsecured creditor in a foreign proceeding).

27.     Consistent with this protective role, this Court has previously recognized the need to sufficiently protect secured creditors where a Chapter 15 foreign representative seeks to remove funds in the United States that are subject to a security interest. *In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 118 (Bankr. S.D.N.Y. 2012) (concluding that although a provision of an ex parte order entered in the Chapter 15 debtor's Mexican insolvency proceedings required that funds in a cash management account located in the U.S. be returned to Mexico, the secured

-17-

party would not be sufficiently protected if the funds, all of which were covered by a perfected

security interest governed by New York law, were returned absent further order of the Court);

*Int'l Banking Corp.*, 439 B.R. at 628-630 (because the foreign administrator sought to send

attached funds over which banks had a perfected security interest under New York law to

Bahrain for administration in the debtors' Bahraini administration proceedings, but had not

explained how it intended to protect the banks' lien in its cash collateral, declining to permit the

administrator to move the funds absent a finding that the underlying attachment orders were

invalid).

        28.      The Foreign Representative has not suggested any basis on which he could

sufficiently protect the interests of BNY Mellon and the Noteholders in the Secured Funds, nor

has he demonstrated that he has any equity interest in such funds.  The Foreign Representative

should not be granted access of any kind to the Secured Funds pursuant to section 1521(a)(5) or

otherwise.  BNY Mellon holds, for the benefit of itself and holders of the Senior Secured Notes,

a valid perfected first priority lien on the Secured Funds.  Making those funds available to the

Foreign Representative or the Debtor to pay administrative, priority or "extra judicial" claims in

Brazil would destroy those lien rights, in derogation of the protections afforded secured claims

under United States law.   The Foreign Representative has not and cannot satisfy section 1522's

sufficient protection requirement with respect to the Secured Funds.

      **C.**      **Any Other U.S. Assets Should Be Entrusted to an Examiner**

        29.      The Foreign Representative represents in the Verified Petition that the

Debtor's only other U.S.-based asset is the Westport Supply Contract Rights.  Although not

discussed in the Verified Petition, as discussed above the Debtor may also possess state-law

claims and causes of action in the United States in connection with, without limitation, the

Westport Transactions.  The Noteholders reserve the right to seek examination of the Foreign

-18-

Representative, the Debtor and its insiders with respect to those and any other assets the Debtor

may have in the United States, and objects to the Foreign Representative being entrusted with

administration and realization of such assets (including claims) under section 1521 without

conditions that sufficiently protect the Noteholders and other parties in interest.

30.     The existence of other potential Debtor assets in the United States beyond

the Westport Supply Contract Rights, including possible causes of action, demands an impartial

representative committed to pursuing and realizing those assets for the benefit of creditors.  The

Noteholders have well founded concerns that the Foreign Representative's connections to the

Debtor's insiders as beneficiaries of the Westport Transactions create a conflict of interest

rendering him unfit to administer the Debtor's U.S. assets so as to sufficiently protect the

interests of creditors.

31.     Section 1522 demands that discretionary relief under section 1521 only be

granted if the interests of creditors and other interested parties are sufficiently protected.  To that

end, the court may subject any relief granted under section 1521 to conditions it considers

appropriate.  11 U.S.C. § 1522(b).  Given the Foreign Representative's potentially crippling

conflict of interest, particularly with respect to claims the Debtor may have in connection with

the Westport Transactions, and the absence of any showing of an immediate need for ancillary

relief under section 1521, the Court should not grant the Foreign Representative any relief under

section 1521 at this time beyond administration of the Westport Supply Contract Rights.

32.     Rather, the Court should appoint (i) an examiner with expanded powers to

investigate, identify, pursue and realize for the benefit of creditors all of the Debtor's non-Debt

Service Reserve Account assets, claims and causes of action in the United States, including any

claims and causes of action related to the Westport Transactions and any other insider

-19-

transactions, (ii) order the Debtor to pay the fees and expenses of the examiner, and (iii) authorize the examiner to cooperate with the Brazilian court, the judicial administrator in the Brazilian Proceeding and any judicial manager appointed in the Brazilian Proceeding. Such relief is consistent with section 1521(a)(5), which permits the Court to entrust administration and realization of a debtor's U.S.-based assets to the foreign representative "or another person, including an examiner, authorized by the court." 11 U.S.C. § 1521(a)(5). Appointment of an examiner to investigate a debtor's or a third party's prepetition conduct and potential claims arising therefrom is appropriate where there is no other party that is willing or able to do so. *See In Granite Broadcasting Corp.,* 369 B.R. 120, 126 (Bankr. S.D.N.Y. 2007), *appeal dismissed by, as moot,* 385 B.R. 41 (Bankr. S.D.N.Y. 2008) (examiner appointed on motion of U.S. trustee to investigate the debtor's and a third party's prepetition conduct where no creditors' committee had been appointed).

33.    The Noteholders respectfully request that, in addition to the appointment of an examiner, the proposed Recognition Order be modified to strike the reference to section 1521(a)(5) in paragraph 10 on page 3, except only as it relates to the Westport Supply Contract Rights, and to strike "with full authority to administer the Debtor's assets and affairs in the United States" in decretal paragraph 4 on page 3.

## CONCLUSION

For the foregoing reasons, the Noteholders respectfully request that the Court deny the Foreign Representative's Verified Petition, or in the alternative, if recognition is granted, enter an order substantially in the form attached hereto as **Exhibit E**, (i) appointing an examiner with the power to investigate, identify, pursue and realize all of the Debtor's assets, claims and causes of action in the United States (other than the Debt Service Reserve Account and the Westport Supply Contract Rights), and ordering the Debtor to pay the fees and expenses

#30055986 v11

incurred by the U.S. examiner, (ii) lifting any injunction against BNY Mellon exercising its

rights to the Secured Funds for the benefit solely of holders of the Senior Secured Notes

(excluding the Debtor and its affiliates and insiders as holders of Senior Secured Notes), and (iii)

granting the Noteholders such other and further relief as the Court deems appropriate.  The

Noteholders reserve the right to supplement this Objection prior to or at any hearing on

recognition, and to conduct appropriate discovery regarding the issues raised herein.

Respectfully submitted,

Dated: October 15, 2014          **PEPPER HAMILTON LLP**

/s/ Ronald R. Jewell
Ronald R. Jewell (Bar No. 1572270)
The New York Times Building, 37th Floor
620 Eighth Avenue
New York, NY 10018-1405
Telephone: 212.808.2700
E-mail: jewellr@pepperlaw.com

-and-

David M. Fournier (*pro hac vice*)
Michael J. Custer (*pro hac vice pending*)
1313 N. Market Street, Suite 5100
Wilmington, DE 19801
Telephone: 302.777.6500
E-mail: fournierd@pepperlaw.com
E-mail: custerm@pepperlaw.com

*Counsel for the Ad Hoc Committee of Certain
Senior Secured Noteholders*

#30055986 v11